*221 OPINION OF THE COURT
Edward J. McLaughlin, J.
The issue now before the court is whether or not the Department of Social Services should be required to pay for an HLA test of white blood cells in a paternity action. This court holds that when the respondent is financially unable to pay for the HLA test, the Department of Social Services must pay the cost of the test. (Family Ct Act, § 532.)
FACTS
A paternity petition was filed by the Onondaga County Commissioner of Social Services on July 17, 1978, alleging that the respondent was the father of a child born out of wedlock to a recipient of public assistance. The case came on on August 31, 1978, at which time the respondent did not appear. Counsel was assigned to the respondent and the matter was adjourned until October 2, 1978. In October, respondent denied the allegations of paternity and requested a blood test. The matter was adjourned, so as to permit the respondent to submit a financial statement to the court since he claimed that he did not have the ability to pay for the tests. Subsequently, it was determined by the court that the respondent was financially unable to pay for the costs of the tests and the Department of Social Services was order to "pay for any and all the blood grouping tests to be given to the respondent and the alleged child and mother” pursuant to section 532 of the Family Court Act. The standard red blood cell groupings were done. The respondent was not excluded.
Respondent then demanded that the Department of Social Services pay for additional blood work, namely, the HLA white blood cell test. The Department of Social Services maintained that it was not its responsibility to pay for such additional blood work.[1]
The court then heard expert testimony on the HLA (human Leukocyte Antigen) test. The hearing was limited primarily to two questions: first, is the HLA test a "blood” test and, second, *222 does the scientific community accept the results of the HLA test as reliable to the same degree that the reliability of the standard blood grouping test is presently accepted? Dr. John B. Henry, a professor of pathology and director of clinical pathology at the Upstate Medical Center in Syracuse, New York, who has carried out paternity testing in Syracuse since 1964, testified. He stated that for the last 20 years blood tests for paternity have been limited to red blood cells. In the last 10 years, however, there has been an increasing awareness and application of white blood cells, "more specifically, lymphocyte blood cell markers” and their application to paternity. The literature in the field has been referring to these tests for five years, and Dr. Henry has personally been using the white blood cell count for paternity testing for approximately two years.
The test is accepted in the scientific community in both Europe and the United States. Dr. Henry stated his familiarity with the American Medical Association (AMA) and The American Bar Association (ABA) joint report on the use of blood tests in paternity suits. He stated that the report indicated that there was an exclusion rate of approximately 60% when the red cell or erythrocyte blood cell markers were tested and that the exclusion percentage was increased to approximately 90% when the HLA test was added.[2] Dr. Henry testified that he agreed with the recommendations of the AMA-ABA report.
In the present case the erythrocyte antigens that were tested for included the ABO, MNSs, the Kell, the Duffy and the RH. The only erythrocyte red blood cell marker test that was not employed was the Kidd System test, since the antis-era was not available at the time that the test was done. On the basis of the five tests done by Dr. Henry, it was not possible to exclude the respondent. In his report to the court, Dr. Henry recommended that further lymphocyte testing be *223 done in this case. In his testimony Dr. Henry stated that he felt absolutely confident about the results of the HLA test, if the replicate was properly carried out.
Dr. Henry further testified that the present cost of the red cell test is $50 per person. The present cost of the white cell test is $100 per person. This cost differential is based upon the extra effort that has to be made to pull out the lymphocytes to test them and also upon the fact that it takes two and a half times as long to perform as does the red cell test.
Dr. Henry also said that at this time the term blood test sometimes did and sometimes did not include in its meaning the white cell test. He himself would recommend that first a series of red cell tests be done. Then, if the respondent was not excluded, a series of white cell tests should then be done. Although the HLA tests can be done without the red cell tests first being done, because of the cost involved and the approximately 60% exclusion rate of the red cell tests, it is Dr. Henry’s opinion that the white cell tests should only be conducted if the first series of tests do not establish an exclusion.
LAW
The Legislature when it enacted article 5 of the Family Court Act establishing paternity proceedings as within the jurisdiction of the Family Court, recognized that "a principal purpose of the proceeding is to resolve problems of support.” (Report of the Joint Legislative Committee on Court Reorganization No. 2 — The Family Court Act, McKinney’s Session Laws 1962, p 3446; see, also, 1965 Atty Gen [Inf Opns] 130). Recognizing that often a paternity proceeding was commenced to shift the burden of supporting the child from the State to the putative father, or at least reducing the amount of support for which the State is responsible, the Legislature enacted section 532 of the Family Court Act,[3] which, inter alia, states *224 that "if the alleged father is financially unable to pay for the costs of a test, the court may direct any qualified public health officer to conduct such test,” and, where the child is likely to be a public charge, "the court may direct payment * * * from the funds of the Public Welfare Officer.” In its report to the Legislature, the Joint Committee on Court Reorganization proposed that "blood tests be required in every [paternity] case to be made by official authorities without direct costs to the parties.” (Joint Leglislative Committee on Court Reorganization, part II, The Family Court Act, p 97; see, also, Committee Comments, McKinney’s Cons Laws of NY, Book 29A, Judiciary Law, Family Ct Act, § 532.) While "the proposal of the committee was considerably broader in scope than the statutory provision which was ultimately adopted by the Legislature * * * its inclusion as a committee comment following the text of section 532 indicates the spirit with which this section should be interpreted.” (Matter of Commissioner of Social Servs. of County of Onondaga v Jay, 82 Misc 2d 1094.)
It has long been the law in New York that the right to a blood test "should not be made dependent upon the financial resources of the defendant”. (People ex rel. Van Epps v Doherty, 261 App Div 86, 87.) When a respondent requested a blood test and was denied an adjournment to obtain one, even though he admitted paternity, the appellate court ordered a new hearing, stating that he had been "denied fundamental rights to defend the charges”. (Matter of R.R. v S.S., 40 AD2d 908.)
Trial courts have pointed out that the blood test not only protects the respondent from "a fake charge of paternity” (Hansom v Hansom, 75 Misc 2d 3), but also that "the public [has] a right to know who is the father of the child or if a particular person is not the father.” (Matter of Schleimer v Swann, 93 Misc 2d 520.) Thus, both the individual and the community are protected from fraud by the use of blood tests to exclude persons scientifically incapable of being the father of a particular child. "An exclusion does not merely impair the petitioner’s credibility, nor does it merely disprove the charge. A blood test exclusion conclusively demonstrates non-paternity.” (Hansom v Hansom, supra, p 8; see, also, Larson, Blood Test Exclusion Procedures in Paternity Litigation: The Uniform Acts and Beyond, 13 J Fam L 713.)
Both children born out of wedlock and putative fathers have *225 been found to possess substantive rights in recent years. For instance, the United States Supreme Court has held that under the equal protection clause of the Fourteenth Amendment a State may not discriminate against illegitimate children by denying them substantial benefits accorded to children generally. (Gomez v Perez, 409 US 535.) Also, a child born out of wedlock may recover from the wrongful death of its mother (Levy v Louisiana, 391 US 68) and may not be discriminated against in payments under the Workmen’s Compensation Law. (Weber v Aetna, 406 US 164.)
The rights of unwed fathers with regard to their children born out of wedlock are being recognized as increasingly significant. For instance, a father is entitled to a hearing on the subject of his child’s custody. (Stanley v Illinois, 405 US 645.) Recently the United States Supreme Court has held that section 111 of the Domestic Relations Law, which permits an unwed mother, but not an unwed father to block the adoption of their child by withholding her consent is an unconstitutional sex-based distinction violative of the equal protection clause of the Fourteenth Amendment of the United States Constitution. (Caban v Mohammed, 441 US 380.)
The AMA-ABA committee report stated that "[o]wing largely to defective and antiquated paternity ascertainment procedures, only a very small faction of illegitimate children now achieve legal relationships with their fathers. All gains in substantive rights will mean little or nothing if our procedures for ascertaining paternity are not improved. * * * We need a new procedural framework for the paternity action improving both quality and volume and, within that new framework, medical evidence must play the cardinal role.” (Joint AMA-ABA Guidelines: Present Status of Serologic Testing in Problems of Disputed Parentage, 10 Fam LQ 247, 250-251.)
To this end the committee recommended the seven serologic systems, ABO, Rh, MNS’s, Kell, Duffy, Kidd, HLA, be used for routine investigations (10 Fam LQ 247, 257), but noted that not all tests are necessary if a respondent is excluded by the preliminary tests. (10 Fam LQ 247, 256.)
It has been stated that the HLA test has initiated "a revolution in paternity testing.” (Terasaki, Resolution by by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing, 16 J Fam L 543.) "With HLA testing, the probability of a nonexcluded male being the actual father is usually over *226 90% ” (16 J Fam L 543). Further, "[t]he HLA System is extremely polymorphic (diverse in numbers of antigens), reaches full expression long before birth, has been detected even in mummies, and, as far as it is known, is unaltered by environmental effects, such as massive blood transfusions, drugs, and onset of disease.” (16 J Fam L 543, 554.) To exclude those who are financially unable to afford it from the benefits of such a powerful test is an affront to notions of equity, if not a blatant barrier to the due process of law.
Federal law requires that a State plan for child support includes a provision that the State "will undertake * * * in the case of a child born out of wedlock with respect to whom an assignment under section 602 (a) (26) of this title [US Code, tit 42, § 602, subd (a), par (26)] is effective, to establish the paternity of such child”. (US Code, tit 42, § 654, subd [4], par [A].) Federal regulations mandate that a "State plan shall provide that: (1) as a condition of eligibility for assistance, each applicant for or recipient of AFDC will be required to cooperate * * * with the State in * * * [establishing the paternity of a child born out of wedlock for whom aid is claimed.” (45 CFR 232.12 [a] [2].) Failure to co-operate results in the denial of assistance. (45 CFR 232.12 [d].) "Co-operate” includes providing verbal or written information to aid the agency in achieving its objective of establishing paternity as well as appearing as a witness at the trial of a paternity suit. (45 CFR 232.12 [b].)
In New York a person who otherwise is eligible for public assistance must "assign to the state and the social services district any rights to support such person may have either in his own benefit or in behalf of any other family member for whom he is applying for or receiving aid.” (Social Services Law, § 349-b, subd 1, par [a].) Further, the person as a further condition of eligibility shall "cooperate with the state and the social services official * * * in establishing the paternity of a child born out-of-wedlock for whom assistance under this title is being applied for or received”. (Social Services Law, § 349-b, subd 1, par [b]; see, also, §§ 111-b, 352-a.) Under the Department of Social Services regulations, "co-operation”, as outlined in the Federal regulations, is required. (18 NYCRR 369.2 [b].)
Given that sustenance is necessary to life, the possibility of mistake in naming an alleged putative father is not particularly surprising when one considers that one must "co-operate” as a prerequisite condition for eligibility for public assist *227 anee. As well as mistakenly naming the the wrong putative father, the possibility exists of collusion between a respondent with "empty pockets” and a person in need of public assistance, even with the penalty of perjury attached to providing false information. (45 CFR 232.12 [b] [3].) Blood tests provide protection to both the alleged father and to the public. Increasing that protection from approximately 60% to approximately 90% by the use of the HLA test provides the best available scientific information to the court, so that a person who is scientifically excluded from the paternity of a child cannot be legally declared the "father”. Commentators have noted that "[considering the interests at stake and the costs of an erroneous decision — to the parties, to society, to the integrity of the legal system — the question of paternity should be dealt with empirically, as a question of genetics.” (The Legal Implications of HLA Testing for Paternity, 16 J Fam L 537.)
To enhance the empirical qualities of paternity proceedings in our county the court holds that when the respondent is financially unable to pay for the HLA tests, and he has not been excluded from paternity by the six red blood cell grouping tests, then the Department of Social Services must pay the cost of the HLA test pursuant to section 532 of the Family Court Act. The respondent’s motion is granted.

. In other counties in New York State there appears to be no question as to whether or not the Social Services Department should pay for the HLA test. For instance a brochure of the Family Court of the State of New York, County of Monroe, dated April 28, 1978, referred to basic testing as "red blood cell antigens and HLA.” The language of the brochure implies that the Department of Social Services pays the costs for basic testing.

. The AMA-ABA report stated that it does not "recommend in all medicolegal problems of disputed parentage that the entire set of tests is mandatory. It is often possible to establish exclusion with the basic blood group systems (ABO, Rh, and MNSs). When these basic tests do not allow exclusion, extended testing may be done (using Kell, Duffy, and Kidd systems) to increase the mean probability of exclusion to the 63-72 percent level. In the event no exclusion is produced at that stage, additional testing using the HLA System * * * may be done to raise the mean probability of exclusion to at least the 90 percent level.” (Joint AMA-ABA Guidelines: Present Status of Serological Testing in Problems of Disputed Parentage, 10 Fam LQ 247, 256.)

. "§ 532. Blood grouping test; costs of test.
"The court, on motion of any party, shall advise the parties of their right to a blood test and shall order the mother, her child and the alleged father to submit to one or more blood grouping tests by a duly qualified physician to determine whether or not the alleged father can be excluded as being the father of the child, and the results of such tests may be received in evidence but only in cases where definite exclusion is established. If the alleged father is financially unable to pay for the costs of a test, the court may direct any qualified public health officer to conduct such test, if practicable; otherwise, the court may direct payment from its own funds where the child is not and is not likely to be a public charge or from the funds of the public welfare officer where the child is or is likely to be a public charge.” (Amended by L 1976, ch 665, eff Jan. 1,1977.)