THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DENNIS PREWITT, Defendant-Appellant.

First District (5th Division) Nos. 85—2052, 85—2209 cons.

Opinion filed September 4, 1987.

Steven Clark and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr.,

Christopher J. Cummings, and Michael L. Vittori, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial defendant was found guilty of murder, attempted murder, and deviate sexual assault. The trial judge sentenced defendant to concurrent terms of imprisonment of 75 years for murder, 40 years for deviate sexual assault, and 15 years for attempted murder. Defendant appeals, alleging that: (1) the prosecutor's comments in closing argument were improper because they were not based on evidence presented at trial; (2) evidence was introduced which suggested defendant had committed other criminal acts; (3) it was improper for the prosecution to insinuate that defendant was a person with criminal tendencies and that other evidence of his guilt existed which the jury did not hear; (4) it was impermissible to allow the admission of hearsay evidence used to persuade the jury to credit the identification of defendant as the offender; (5) it was improper for the prosecution to accuse defense counsel of attempting to confuse the State's witness; (6) the imposition of an extended term of imprisonment for the offense of sexual assault was unauthorized because defendant was also convicted and sentenced for the more serious offense of murder; (7) the jury returned a single verdict of guilty of murder and a single verdict of guilty of deviate sexual assault; therefore, two of defendant's three murder convictions and one of defendant's two deviate sexual assault convictions must be vacated; and (8) convictions entered on two of three counts of murder must be vacated because defendant was charged and convicted of murdering one person.

We affirm in part, vacate in part, and remand for resentencing.

The following facts are pertinent to our disposition of this cause. On December 25, 1983, two women were shot in the head at Obadiah Food Store after being forced at gunpoint to perform deviate sexual acts on their assailant. One of the women, A.S., survived and identified defendant as the offender. Defendant admitted being in the store that morning but denied having committed the offenses.

George Kyros, the owner of Daley's Restaurant, located one block from Obadiah's, testified at trial that on December 25, 1983, he opened the restaurant at 5 a.m. The defendant was waiting for the restaurant to open when Kyros let him in, defendant hung around the register, seated himself, and then ate breakfast. Kyros said that defendant was wearing a greyish-brown long jacket and, after initially testifying he did not remember if he was wearing anything on

his head, identified his hat. Defendant left the restaurant at about 7 a.m.

A.S., day manager of Obadiah Food Store, testified that when she drove to the store at 7 a.m. her co-worker, C.C., was waiting outside. The weather was extremely cold. Once inside the store A.S. placed change in the register and started the heater in the back of the store. The two women were in front of the store at 8 a.m. when a customer, identified at trial as defendant, entered the store. He placed a box of cornflakes, a bar of soap, tissue paper, and Alpo dog food on the counter and presented a $20 bill, for which the women did not have change. The defendant said he would return after exchanging the bill at a newspaper stand.

The defendant returned in about 10 minutes, locked the door from the inside, and pulled out a small silver gun. C.C. opened the register and told him, "[D]on't kill us, we'll give you all the money." Defendant placed a newspaper on the counter and told them to go into the storeroom in back of the store, where he directed them to undress. All this time, defendant was pointing a gun at them. Both women took off their clothes. At that moment, the phone rang and defendant made C.C. answer the phone, telling her to say she was busy and hang up. He then forced each of them to perform an act of oral copulation upon him. He ejaculated in A.S.'s mouth. She spit out his semen. Defendant then said he had to kill them because they had seen his face. They prayed and screamed. C.C. held on to A.S.'s leg and defendant grabbed C.C. and threw her in a bathroom behind the storeroom, where he shot her three times in the head. A.S. was also thrown in the bathroom, tried to hide under the sink but was also shot three times. The first shot struck the left side of her head. The second shot went through her hand when she tried to protect herself and the third shot went into her shoulder. A.S. acted as if she were dead and he ran out the door. After she heard the defendant exit the store, she got up and put on some clothes. She called Kim Johnson, a manager of Obadiah's at another location, and told her that C.C. was dead and that Johnson should call the owners, Mr. and Mrs. Brown. Next, A.S. called Mrs. Brown and told her to come to the store because something bad had happened. A.S. called the police, dropped the phone, walked to the front door, and collapsed.

A.S. was taken to Billings Hospital, where she gave a description of her assailant to the police. She described her assailant to Officer Garrity as a black male, between 35 to 40 years old, 5 feet 8 inches to 6 feet tall, potbellied, with a light complexion, light freckles, reddish mustache, light brown hair, and wearing a dark hat and a brown

coat. Officer Garrity did not mention the freckles or potbelly in his report and was not sure that he had written it anywhere.

Dr. George Dohrman testified that he was the attending physician at Billings Hospital on the day that A.S. was assaulted and shot. A.S. was awake, alert, and able to answer all of his questions. Dr. Dohrman removed a bullet fragment from A.S. which had lodged against the skull and caused bone fragments to pierce her brain.

After two weeks at Billings, A.S. was transferred to Mercy Hospital, where for two months she was in therapy and rehabilitation. There the police would occasionally show her photo albums of possible assailants, but she did not recognize any of them. On February 16, 1984, two detectives showed her six photographs and she identified the photo of the defendant as the assailant.

John Conner, a newspaper vendor, testified at trial that on December 25, 1983, he was working at the newsstand near Obadiah's Food Store. At 8 a.m. the defendant asked Conner if he could change a $20 bill for him. Conner told defendant to get change at Daley's and asked that defendant bring him a cup of coffee. Defendant did not bring him coffee and Conner did not know if he came back for a paper. Conner testified that defendant's hat and coat looked like the clothing the man wore but admitted that he could not be sure that was the hat.

Officer Jimmy O. Marbury, investigating officer on the case, testified that he had a conversation with an unidentified citizen and as a result began searching for a man named Red, who was described as a black male, with a light complexion, reddish brown hair, freckles, and a large stomach. Also, he was looking for this person's girlfriend, Crystal. Marbury said that on February 15, 1984, a bar owner informed him that an individual matching the above description was present in the bar. Marbury saw a man matching the description, approached him and said, "Hello, Red, how you do," to which the defendant replied, "Fine." Marbury told him he was under arrest, but did not specify the charges, advised him of his rights, and transported him to the police station.

Officer Willie Johnson testified that he spoke with defendant following the arrest. Defendant told him he knew nothing about a murder at the food store. On three occasions the defendant said he had never been in the store. With defendant's permission, his photograph was taken. It was this photograph amongst five others which was taken to the hospital and shown to A.S.

Michael E. Zefeldt, a Chicago police officer detailed to the Microanalysis Unit of the Chicago Crime Laboratory, testified that he ob-

tained an oral swab taken from A.S.'s mouth. Spermatozoa were present with A.S.'s saliva, which was indicative of her being forced to engage in oral copulation with a nonsecretor. Zefeldt also determined that C.C. had type A blood, A.S. was a type A secretor and defendant was a type 0 nonsecretor. He testified that 20% of the population are nonsecretors, which means their blood group substances are not present in their other bodily fluids. Additionally, Zefeldt examined defendant's coat and hat and found no sperm, saliva, blood, nitrates, or any substance which comes out of the barrel of a gun. It was also determined that C.C. was shot in the head at a range of approximately six inches or less from the gun to her head.

The parties entered into the following stipulations. C.C. was shot three times in the head, each wound within 1¼ inches of each other. These wounds were the cause of her death. Four out of five bullets recovered were fired from the same weapon but the origin of the fifth bullet could not be determined. Finally, it was stipulated that defendant's fingerprints matched those of the prints found on the box of cornflakes located on the counter of Obadiah's store the morning of the murder. The prosecution then rested.

Defendant testified that on the morning of December 25, 1983, he was at the home of a friend until at least 6 a.m. He had been at a bar from midnight to 5 a.m. He walked to Daley's from his friend's house and had breakfast. He was there for about half an hour and then headed home at about 7 a.m. He stopped at the Obadiah Food Store to pick up some groceries. When told they had no change for a $20 bill, defendant said he would get change. He went to the paper stand and then to Daley's, where he ran into a friend and they had coffee for about 20 minutes. On his way back to the store he picked up a paper. When he entered the store no one was at the counter. He yelled for assistance and then walked to the rear of the store, where he saw two women nude from the waist down in the back room. He left and went to his home. Defendant said that he did not try to help when he saw the bodies because he was afraid someone would walk in and find him there. Defendant's wife testified that he woke her up about 7:30 a.m. that morning. The defense then rested.

The jury returned verdicts finding defendant guilty of murder, attempted murder, and deviate sexual assault. The prosecution elected to seek the death penalty and defendant waived his right to a jury on that issue. Post-trial motions were denied and the trial judge sentenced defendant to concurrent terms of imprisonment of 75 years on three counts of murder, 40 years for deviate sexual assault and 15 years for attempted murder.

Opinion

Initially defendant contends that the prosecutor's comments during closing argument were improper. The argument purported to demonstrate that it was impossible for anyone other than defendant to have committed the offense. Starting from the proposition that 20% of the population are nonsecretors and by assigning the defendant's individual characteristics with certain probabilities, the prosecutor deduced that defendant, being a nonsecretor, was certainly the offender. Aside from the initial proposition, the prosecutor based his theory entirely on conjecture. There was no objection to the prosecutor's remarks and no claim of error in the motion for a new trial with regard to these comments. The prosecution therefore maintains that defendant has waived this contention.

 █ We agree. Any error arising from the remarks was waived. (*People v. Smith* (1987), 158 Ill. App. 3d 595.) Furthermore, the nature of the alleged error is not of such magnitude as to justify the application of the plain error doctrine. (*People v. Szabo* (1983), 94 Ill. 2d 327, 447 N.E.2d 193.) This is not a situation wherein the prosecutor produced a mathematician or other expert witnesses to testify to the veracity of the statistics. Such reference to expert testimony may well unduly influence a jury. (See *People v. Collins* (1968), 68 Cal. 2d 319, 438 P.2d 33, 66 Cal. Rptr. 497.) Here it was clear that the numbers produced by the prosecutor were the result of his own computations and were not based on testimony. Although the better practice would have been to avoid any reference to statistics not in the record, the defendant was not prejudiced by the remarks. The trial judge instructed the jury that closing arguments are not evidence and any statements made in argument not based on evidence should be disregarded. The court took proper measures to guard against any prejudicial effect upon the jury. (*Taylor v. Carborundum Co.* (1969), 107 Ill. App. 2d 12, 246 N.E.2d 898.) In this context we do not find that the prosecutor's highly speculative argument was prejudicial.

██ Defendant next contends that the prosecutor engaged in two instances of misconduct which were designed to persuade the jury that defendant had criminal tendencies. First, Detective Johnson testified that he called the fingerprint unit of the police department and "requested that the record under [defendant's] I.R. Number be pulled with his fingerprints" and that those be compared with the prints found at the scene. He received a call from that unit shortly afterwards informing him a match had been made. The defendant, citing *People v. Hudson* (1972), 7 Ill. App. 3d 333, 287 N.E.2d 297, asserts

that reference to defendant's "I.R. number" unnecessarily suggested he had a criminal background to the jury.

The facts in *Hudson* are readily distinguishable from the circumstances at bar. In *Hudson* the fingerprint expert made repeated reference to fingerprint cards which he obtained. This is not the case here, where there is an isolated reference to an ambiguous term, "I.R. number," particularly because defendant took no steps to have it excluded from the record or to have the jury instructed to disregard it. (*People v. Coleman* (1974), 17 Ill. App. 3d 421, 308 N.E.2d 364.) Here, we find that the statement elicited from Detective Johnson on direct examination did not constitute evidence of another crime. Even assuming that the jury understood the meaning of an "I.R. number," it is reasonable to believe that fingerprints may be on file with the police for a number of reasons unrelated to prior criminal activity. (See *People v. Gordon* (1981), 94 Ill. App. 3d 764, 419 N.E.2d 66.) There are a variety of reasons for a police department to have fingerprints on file, for example, fingerprints of crime victims may be on file, as may the fingerprints of security personnel. In addition, in the present case the prosecutor made no references to prior arrests or convictions, nor was the file containing the number introduced into evidence. Because the reference was singular and ambiguous, in that it did not indicate that the defendant had a prior criminal record, we hold that the statement did not constitute reversible error. See *People v. Gordon* (1981), 94 Ill. App. 3d 764, 419 N.E.2d 66.

■ The next instance of alleged misconduct involved the questioning of defendant with regard to the frequency with which he carried a gun. On direct examination the defendant testified that while in police custody he made a statement to an assistant State's Attorney. The defendant told her what to write and the defendant signed the statement when it was complete. On cross-examination, the defendant was questioned regarding the statement. The questioning went as follows:

"Q. Now, Mr. Prewitt, you gave a statement to the Assistant State's Attorney, a written statement, right?

A. Yes, I did.

Q. And in that statement you mentioned that you use [*sic*] to carry a gun for protection didn't you?

A. Yes, I did.

Q. And you had more than one gun, didn't you?

DEFENSE COUNSEL: Objection to that, Judge.

THE COURT: Overruled. I will let him answer yes or no.

DEFENDANT: A. No.

STATE'S ATTORNEY: Q. You just had one gun. What kind of gun was it?

A. .32 automatic."

Generally evidence of a distinct substantive offense cannot be admitted in prosecution for a different offense. (*People v. Ciucci* (1956), 8 Ill. 2d 619, 137 N.E.2d 40.) When the evidence of prior criminality is not direct, but merely inferential, the determinate issue is the probative and prejudicial effect of the nexus between the testimony admitted and prior criminality. (*People v. Coleman* (1974), 17 Ill. App. 3d 421, 308 N.E.2d 364.) Here, while the testimony was improper, its prejudicial effect does not justify the application of the plain error doctrine. See *People v. Gacy* (1984), 103 Ill. 2d 1, 468 N.E.2d 1171.

■ The defendant next contends that he was prejudiced when the prosecutor was allowed to cross-examine him about having offered a friend one of the two guns he owned for protection. The prosecution maintains that such cross-examination was proper because the defendant testified on direct examination that he told the assistant State's Attorney that he carried a gun for protection. We have already determined that the introduction of the testimony regarding defendant's gun was improper. Likewise, the admission of the testimony that defendant gave a gun to a friend was improper. Again, however, the prejudicial effect, if any, upon the jury does not justify the application of the plain error doctrine. (*People v. Gacy* (1984), 103 Ill. 2d 1, 468 N.E.2d 1171.) Furthermore, even looking at the cumulative effect of the two statements, the error is harmless.

■ Defendant next contends that it was improper to allow hearsay evidence to persuade the jury that A.S.'s identification was accurate. On cross-examination the prosecutor elicited testimony from a police officer that A.S. had viewed a photograph of a man named Ralph Owens. Owens had been arrested in the vicinity of Obadiah Food Store shortly after the December 25 shooting. At the time of the arrest he was carrying a .25 caliber automatic pistol. Further, he resembled the general description of the offender. However, a comparison of his prints with prints from the scene was negative and a ballistics test demonstrated his gun was not the weapon used to shoot A.S. and C.C. There was no objection to the admission of this evidence. In closing argument, the prosecutor referred to this evidence as demonstrating the strength of A.S.'s identification. Defendant contends that this reference to hearsay evidence denied him a fair trial.

We disagree. It has long been the law in this State that when

hearsay is admitted without objection, it is to be considered and given its natural probative effect. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.) Here, by failing to object to the admission of the testimony regarding Ralph Owens, defendant has waived any issue of prejudice. If defendant had contemporaneously objected to the testimony, the prosecution would have had the opportunity to lay the proper foundation. It would be manifestly unfair to allow a defendant to object in closing argument on evidence introduced without his objection.

■ Defendant next contends that it was improper for the prosecutor to argue that defense counsel might have attempted to confuse the witness. On direct examination A.S. testified that on February 16, 1984, two police officers showed her six photographs. She identified the photograph of the defendant as her assailant. On cross-examination, A.S. testified that the identification took place on the 18th of February. She then corrected herself on redirect. In closing argument the prosecutor stated:

"As far as the date of the day [A.S.] identified his photograph, the date February 18th was brought up by [defense counsel], maybe in an attempt to confuse [A.S.], but I don't know but he said it was on February 18th.

DEFENSE COUNSEL: I object to that.

THE COURT: Overruled.

STATE'S ATTORNEY: That she identified the photo, so said yes, she wasn't listening for the date. He put in February 18th, and yes, I corrected it.

DEFENSE COUNSEL: Again, I object.

THE COURT: Overruled.

STATE'S ATTORNEY: Those were his words."

Where it appears that improper remarks made by the prosecution in final argument do not constitute a material factor in the conviction, or they are of such a minor character that prejudice is not probable result, the verdict will not be disturbed. (*City of Chicago v. Lawrence* (1969), 42 Ill. 2d 461, 248 N.E.2d 71.)

"A trial attorney should not engage in personal vituperation, however long and arduous the litigation. Abusing opposing counsel has no proper place in the trial. However, the reviewing court will take into consideration that in a trial the nerves may become frayed causing occasional sharp exchanges to occur. Reversal will not necessarily follow where the instances were few, brief, isolated and not of such character to prejudice a party by the degradation of their counsel." (*Johnson v. Cun-*

*ningham* (1969), 104 Ill. App. 2d 406, 410, 244 N.E.2d 205.) (R. Hunter, Trial Handbook for Illinois Lawyers sec. 80.31 (5th ed. 1983).) Here, the comment was isolated and not of the character to prejudice defendant.

■ Defendant's final contentions are with regard to the imposition of his sentence. Initially, defendant contends that the imposition of an extended term of imprisonment for the offense of deviate sexual assault was unauthorized where defendant was also convicted and sentenced for the more serious offense of murder. We agree. The maximum term authorized by statute for deviate sexual assault is 30 years. (Ill. Rev. Stat. 1983, ch. 38, par. 11—3.) It was improperly imposed for an offense that does not belong to the most serious class of offense of which the defendant was convicted. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2(a).) We therefore vacate this sentence and remand for resentencing.

■ The defendant's final contention is that the trial court improperly sentenced defendant based on three counts of murder and two counts of deviate sexual assault. In determining what judgment and sentence was imposed, we are confined to the record. (*People v. Tackett* (1985), 130 Ill. App. 3d 347, 474 N.E.2d 451.) Suffice it to say that the record has conflicting evidence with regard to defendant's sentencing. It is clear that the jury returned single verdicts of murder, deviate sexual assault, and attempted murder, but it would appear that judgment was entered on three counts of murder and possibly on two counts of deviate sexual assault. Accordingly we vacate defendant's convictions and remand for entry of judgments on a single count of each charge and for resentencing.

Affirmed in part, vacated in part and remanded for resentencing.

SULLIVAN, P.J., and PINCHAM, J., concur.