James **PEARSON**, Appellant (Defendant),

v.

The **STATE** of Wyoming, Appellee (Plaintiff).

No. 90–96.

Supreme Court of Wyoming.

May 15, 1991.

Rehearing Denied June 14, 1991.

Leonard D. Munker, State Public Defender, Gerald M. Gallivan, Defender Aid Program, and Deborah A. Gabriel, Student Director, Defender Aid Program, argued, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia Lee Hackl, Deputy Atty. Gen., argued, and Karen A. Byrne, Sr. Asst. Atty. Gen., for appellee.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

CARDINE, Justice.

James Pearson challenges his forgery conviction. The issues he brings concern the admission of evidence over objection which he contends violated W.R.E. 404, the State's closing argument, and his refused instructions concerning eyewitness identification.

We affirm.

Pearson frames the issues as:

"I. Whether the court below erred when it admitted evidence of Mr. Pearson's prior bad acts in violation of W.R.E. 404(b) when an alibi witness was improperly cross examined.

"II. Whether the court below erred by allowing the prosecutor to discuss mathematical probabilities in his closing argument.

"III. Whether the court below erred when it refused to give requested cautionary jury instructions regarding the limitations of eyewitness testimony and the factors to consider in assessing the reliability of eyewitness testimony."

About 3:00 p.m. on August 16, 1989, Ray Spearman discovered that his briefcase was missing from his truck parked at a Casper savings and loan. Inside the briefcase were various business papers and two checkbooks. One of the checkbooks was for his personal checking account at Hilltop National Bank. A man found the briefcase that evening and returned it to Spearman two days later. Although the Hilltop checkbook remained in the briefcase, Spearman discovered one check had been removed.

Sometime between 4:20 p.m. and 4:30 p.m. on August 16, a 1986 blue Z 28 Camaro entered one of the drive-up lanes at Hilltop Bank. A man identified as Pearson was driving the car. The missing check, made payable to Spearman for $500, was sent from the car through a pneumatic tube to the teller booth located about 25 feet from the drive-up lane. The teller asked the driver if he had a driver's license. After the driver said he did not have one, the teller asked him if he was Spearman. The driver indicated that a passenger in the front seat of the car was Spearman. The passenger was slumped in the seat, and the teller could not see the passenger as well as she could see the driver. The teller retrieved and examined Spearman's signature card. Because the teller was not certain that the signatures on the check and the card matched, she went to get her supervisor. When she returned to the teller booth, the car had left.

The teller gave a description of the driver and the car, including the model and year, to the police. On August 23, 1989, a Casper police detective spotted a car matching the description the teller had given. The detective observed Pearson driving the vehicle and followed it to a convenience store and to Pearson's home. Through a license plate check, the detective determined that the vehicle was registered to Pearson. The detective prepared a photo lineup with eight pictures of the faces of similar looking men. One of the men was

Pearson. He then took a photograph of the vehicle. The detective went to the bank and showed the photo lineup to the teller. The teller identified Pearson from the lineup without any help or suggestion from the detective. The teller identified the car in the photograph as the one in which a man had attempted to pass the forged check. Pearson was subsequently charged with forgery under W.S. 6–3–602.

Pearson pled not guilty and utilized an alibi defense. At the trial, the State's witnesses included the teller who identified the defendant. She testified that her attention was drawn to the car because she was interested in Z 28 Camaros and had once owned one similar to Pearson's. She noticed the silver striping on it and the nearly new condition of the car. She was able to identify the model and year of the car as 1986 because she was familiar with the design changes in the car due to her interest in Camaros. Pearson is a tall black man whose head rose above the headrest as he sat in the car. These physical features contributed to her certainty that the defendant was the driver of the vehicle. She also testified that she had received training in fraud detection including making close observations of persons.

Two people testified as alibi witnesses for Pearson. During the cross-examination of one witness, the State asked him:

"Q: [By the State]: Isn't it true * * * that you have been an alibi witness for the defendant before?
"A: Yes."

Pearson objected:

"[Pearson's counsel]: Objection, I don't see the relevance, Your Honor, has nothing to do with this case before the court.
"[The State]: Shows bias, goes to credibility.
"The Court: I will overrule the objection."

Pearson also presented a witness, a friend who worked at the bank. She testified that she observed a different vehicle at the drive-up lane than the one owned by Pearson at the time the incident occurred. The only other witness for Pearson was also employed at the bank. He testified that, sometime after the check passing incident, Pearson's friend reported to him that the vehicle she had seen was not a Camaro.

In its closing, the State discussed the credibility of the teller's eyewitness identification. In summarizing her credibility, the State argued:

"That is what tells you that [the teller] is to be believed, because her testimony is supported by all of the other evidence. * * * She picks out the person in that line up that happens to be incredibly tall, that happens to own a car. I guess the million dollar question is, folks, * * * how many black men in town that are that tall, that you think own that kind of car like that. That tells you that her identification is correct."

Pearson objected at this point contending the State was making a mathematical type argument. The objection was overruled, and the State continued its closing argument by reiterating:

"What are the odds in Casper, Wyoming, that there is another very tall, black man with a Chevrolet Camaro Z 28, that is a 1986, she recognized the car as a 1986, what are the odds? And then she looked at it and says, that is the car. That is the one I saw."

Pearson's closing argument attacked the credibility of the teller's identification.

The jury found Pearson guilty of forgery. He received a sentence of three to five years in the state penitentiary.

Pearson claims that the State's questioning of one of his witnesses concerning that witness having previously provided an alibi for Pearson violated W.R.E. 404(b). The State argues that we should analyze this issue under our plain error standard of review because of the way Pearson objected to the question. When an objection is inadequate to alert the trial court to a problem, the admission of evidence must rise to plain error before it will be considered by this court. *Schmunk v. State*, 714 P.2d 724, 739 (Wyo.1986). Pearson objected to the question on the basis of relevancy. Admission of this evidence and evidence under W.R.E. 404(b) is a question

of relevance. *See State v. Ellis,* 208 Neb. 379, 303 N.W.2d 741, 749 (1981). Pearson's objection was sufficient to raise the issue before this court. Plain error analysis is unwarranted for this issue.

■ W.R.E. 404(b) states:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The question concerning providing a prior alibi and the witness's affirmative response were not admitted "to prove the character of [Pearson] in order to show that he acted in conformity therewith." W.R.E. 404(b). In response to the objection, the prosecutor stated the question went toward the bias of the witness, and thus credibility of the witness was involved. Pearson argues that "[t]he clear implication of this question was that the defendant had been in trouble * * * before." However, he does not elaborate on this statement. The line of questioning when Pearson made the objection concerned reasons for the witness to have a bias in favor of Pearson. The testimony had nothing to do with Pearson's character.

■ Attempts to demonstrate bias through cross-examination are subject to the wide discretion of the trial court in determining the admissibility of evidence. *Loomer v. State,* 768 P.2d 1042, 1048 (Wyo. 1989). The court's discretionary ruling on evidence will not be upset absent a clear abuse of discretion. *Nimmo v. State,* 603 P.2d 386, 392 (Wyo.1979). The appellant has the burden to demonstrate that an abuse of discretion exists. *Id.* A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did. An abuse of discretion has been said to mean an error of law committed by

the court under the circumstances. *Mayer v. State,* 618 P.2d 127, 131 (Wyo.1980).

We cannot conclude that the question and answer resulted in a violation of W.R.E. 404(b). The fact that a witness's bias might be tied to the defendant in a manner that he would prefer not be divulged before the court does not necessarily implicate the restrictions of 404(b). Bias can be shown from having been with a defendant in jail without invoking 404(b) concerns. *Stephens v. State,* 252 Ala. 183, 40 So.2d 90, 92 (1949); 2 C. Torcia, Wharton's Criminal Evidence § 406 at 674 (14th ed. 1986). Similarly, impeachment of a defendant's witness through disclosure that he was on parole will not necessarily amount to evidence of other crimes. *Hall v. United States,* 540 A.2d 442, 447 (D.C. App.1988). *See also United States v. Abel,* 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984) (cross-examination of witness concerning membership in prison gang permissible to show bias) and *United States v. Greschner,* 802 F.2d 373, 382 (10th Cir. 1986) (cross-examination of witness concerning time spent in prison permissible to show bias toward defendant and against the government). The question asked in this case is in a similar vein. Further, no circumstances of the witness's earlier alibi statement were elicited or given, and the record gives no other indication of the circumstances of the same. We cannot find a clear abuse of discretion in admitting the question and answer to show bias.

■ Pearson's second issue concerns the use of mathematical type statements in the State's closing argument. He places much reliance upon the case of *People v. Collins,* 68 Cal.2d 319, 66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176 (1968). In *Collins,* the victim of a robbery was unable to identify the defendant. 66 Cal.Rptr. at 500, 438 P.2d at 36. In an attempt to combat this deficiency in its case, the prosecution had a mathematician testify as to the probability the defendant and his girlfriend were the perpetrators of the crime. *Id.* The California court found the statistics were flawed and that such use of probability as evidence was unfair. *Id.* 66 Cal.Rptr.

at 502, 438 P.2d at 38. *Collins* is distinguishable from this case in two respects. First, a positive identification was made by a witness in this case. Second, the probability type statements were argument and not presented as evidence.

Pearson also looks to a law review article by Professor Laurence H. Tribe to explain the problems with using statistics as evidence. Tribe, *Trial by Mathematics: Precision and Ritual in the Legal Process*, 84 Harv.L.Rev. 1329 (1971). Professor Tribe, however, differentiates between using mathematics as a means for proof and as a "language." 84 Harv.L.Rev. at 1331. Professor Tribe does not find the use of mathematics as a "language" to be problematic. *Id.* As used by the State in its closing, the mathematical type statements were used as language not as a means of proof.

 To determine the propriety of a closing argument, we examine it in its entirety. *Hopkinson v. State*, 632 P.2d 79, 166 (Wyo.1981). The purpose of closing argument is to allow counsel to offer ways of viewing the significance of the evidence. *Wheeler v. State*, 691 P.2d 599, 605 (Wyo. 1984). The scope of permissible argument by counsel to the jury is within the discretion of the trial court and will not be disturbed absent a clear or patent abuse of discretion. *Mayer*, 618 P.2d at 132. The court should allow a wide latitude of comment on the evidence. *State v. Spears*, 76 Wyo. 82, 300 P.2d 551, 561 (1956).

The remarks in question came after the State summarized the reasons why the teller was a credible and believable witness. The reasons included the teller's training in identification, her interest in Camaros and her picking the defendant out of photo lineup. These remarks amounted to nothing more than rhetorical questions properly used in closing argument. *Cf. Thomas v. State*, 784 P.2d 237, 240 (Wyo.1989). The mathematical type statements did not amount to evidence, but were used as "language" to tie together the reason's why the teller should be believed. *See, e.g., State v. Noel*, 693 S.W.2d 317 (Mo.App. 1985) (statement in closing argument concerning the percentage of black men who

kill other blacks held not prejudicial). Argument as to what is more likely—more probable—is often heard in the trial arena. It is proper. It is argument and nothing more. We find no error in the trial court overruling the objection to the State's argument.

Pearson's final issue concerns the refusal of offered jury instructions. Although six of Pearson's jury instructions were refused, Pearson contests only three of them. The three refused instructions dealt with eyewitness identification testimony. Defendant's offered Instruction 9 provided:

"YOU ARE INSTRUCTED that identification testimony is an expression of belief or impression by the witnesses. Its value depends on the opportunity the witnesses had to observe the offender at the time of the offense and to make a reliable identification later.

"Whether the witnesses had an adequate opportunity to observe the offender at the time of the offense will be affected by such matters as how long or short of time was available, how far or close the witnesses were, how good were lighting conditions, the confusion of the moment, the possible likeness or similarity to other persons.

"You may take into account both the strength of the identifications, and the circumstances under which the identifications were made.

"If the identifications by the witnesses may have been influenced by the circumstances under which Defendant's picture was presented to them for identification, you should scrutinize the identifications with great care. You may also consider the length of time that lapsed between the occurrence of the crime and the next opportunity of the witnesses to see that Defendant, as a factor bearing on the reliability of the identifications.

"The burden of proof on the State extends to every element of the crime charged, and you have been instructed in another instruction that this includes the burden of proof and beyond a reasonable doubt the identity of the Defendant as a

perpetrator of the crimes with which he stands charged."

Defendant's offered Instruction 12 provided:

"YOU ARE INSTRUCTED that with respect to identification the possibility of human error or mistake and the probable likeness or similarity of objects and persons are elements that you must act upon in considering testimony. You must carefully consider these factors in passing upon the credibility that you attach to a witness['s] testimony and you must be satisfied beyond a reasonable doubt as to the accuracy of the witness['s] identification."

Defendant's offered Instruction 14 provided:

"YOU ARE INSTRUCTED that one of the issues in this case is the identification of the Defendant as the perpetrator of the crime. The State has the burden of providing identity, beyond a reasonable doubt. It is not essential that the witness himself be free from doubt as to the correctness of the statement. However you, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the identification of the Defendant before you may convict him. If you are not convinced beyond a reasonable doubt of the accuracy of the identification of the Defendant as the person who committed the crime, you must find the Defendant not guilty.

"Identification testimony is an expression of belief or impression of the witness. Its value depends on the opportunity the witness had to observe the offender at the time of the offense and to make a reliable identification later.

"In appraising the identification testimony of a witness, you should consider the following:

"Are you convinced that the witness had the capacity and an adequate opportunity to observe the offender?

"Whether the witness had an adequate opportunity to observe the offender at the time of the offense will be affected by such matters as how long or short a time was available, how far or close the witness was, how good were lighting conditions, whether the witness had had occasion to see or know the person in the past.

"In general a witness bases any identification makes on his perception through the uses of his senses. Usually the witness identifies an offender by the sense of sight—but this is not necessarily so, and he may use other senses.

"Are you satisfied that the identification made by the witness subsequent to the offense was the product of his own recollection? You may take into account both the strength of the identification, and the circumstances under which the identification was made.

"If the identification by the witness may have been influenced by the circumstances under which the Defendant was presented to him for identification, you should scrutinize the identification with great care. You may also consider the length of time lapsed between the occurrence of the crime and the opportunity of the witness to see Defendant, as a factor bearing on the reliability of the identification.

"You may also take into account that an identification made by picking the Defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the Defendant alone to the witness.

"You may take into account any occasions in which the witness failed to make an identification of the Defendant, or made an identification that was inconsistent with his identification at trial.

"Finally you must consider the credibility of each identification witness in the same way as any other witness, consider whether he is truthful, and consider whether he has the capacity and opportunity to make a reliable observation on the matter covered in this testimony.

"I again emphasize that the burden of proof on the prosecutor extends to every element of the crime with which he stands charged. If after examining the testimony, you have a reasonable doubt

as to the accuracy of identification, you must find the Defendant not guilty."

Pearson's theory of the case was that he was not the man who passed the check to the drive-up teller. The trial court has a duty to present an instruction supporting the defendant's theory of defense, if the instruction is supported by competent evidence. *Stapleman v. State,* 680 P.2d 73, 75 (Wyo.1984). However, the court may refuse an instruction which is argumentative or unduly emphasizes one aspect of the law. *Prime v. State,* 767 P.2d 149, 154 (Wyo.1989). A court also may refuse an instruction if the principle is covered by other instructions. *Griffin v. State,* 749 P.2d 246, 256 (Wyo.1988).

These instructions are based on the "Model Special Instructions on Identification" adopted by the United States Court of Appeals, District of Columbia Circuit, in *United States v. Telfaire,* 469 F.2d 552, 558 (D.C.Cir.1972). We rejected the blanket use of the so-called *Telfaire* instructions in *Thomas,* 784 P.2d 237. We said in *Thomas* that such instructions "stand for the proposition that eyewitness identification testimony is *inherently* suspect in *all* cases." 784 P.2d at 240 (emphasis in original). Instruction 14 is nearly identical to the refused instruction in *Thomas.* All three of the instructions, as the refused instruction in *Thomas,* contain two components: burden of proof of identity and credibility of eyewitness identification testimony. As in *Thomas,* the instructions represent " 'a skillful effort to induce the trial court to argue the case for the defense through its instructions.' " 784 P.2d at 240 (quoting *Prime,* 767 P.2d at 154). General instructions on reasonable doubt and credibility of witnesses are sufficient to cover this part of the defendant's theory of the case. *Id.* Instructions 2, 4, 5, and 6 adequately covered these areas. It was proper for the trial court to refuse these instructions.

Affirmed.

URBIGKIT, C.J., files a dissenting opinion.

URBIGKIT, Chief Justice, dissenting.

Appellant James Pearson was refused an eyewitness instruction that the State must prove his identity as the perpetrator beyond a reasonable doubt and the jurors' deliberations should consciously consider both the capacity and opportunity of the prosecutor's sole eyewitness to observe the perpetrator. The nature of the injustice is magnified by the character of the evidence of any guilt, the minimal proof provided and the progression of unfavorable trial events with which Pearson was faced.

I dissent because I believe the due process component of the Wyoming Constitution requires a *Telfaire* kind of instruction be given when eyewitness testimony is a critical component of the prosecution's case. *United States v. Telfaire,* 469 F.2d 552 (1972). *See Thomas v. State,* 784 P.2d 237 (Wyo.1989), Urbigkit, J., specially concurring. Pearson's theory of defense rested on the supposition that the prosecutor's eyewitness was mistaken. *See Oien v. State,* 797 P.2d 544 (Wyo.1990) and *Thom v. State,* 792 P.2d 192 (Wyo.1990). I would adopt the reasoning and position taken by numerous courts that encourage such instruction. *See United States v. Moore,* 786 F.2d 1308, 1313, *reh'g denied* 791 F.2d 928 (5th Cir.1986); *United States v. Downing,* 753 F.2d 1224, 1231–32 (3rd Cir.1985); *State v. Chapple,* 135 Ariz. 281, 660 P.2d 1208, 1220–24 (1983); *People v. McDonald,* 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709, 726–27 (1984); and *State v. Alger,* 115 Idaho 42, 764 P.2d 119, 127–28 (1988). The Idaho court, seeking "to promote justice through a flexible approach to truth-seeking", *Alger,* 764 P.2d at 126, argues that the emerging role for empirical research is to " 'set a background context for deciding crucial factual issues at trial.' " *Id.* at 128 (quoting Walker and Monahan, *Social Frameworks: A New Use of Social Science in Law,* 73 U.Va.L.Rev. 559, 598 (1987)). I agree.

The majority's reasoning has wedged itself solidly between the proverbial rock and a hard place. In affirming the trial court's denial of the offered instruction, the majority reasons that the "general instructions

on reasonable doubt and credibility of witnesses are sufficient to cover" the defendant's theory of the case, but then turns to declare that the offered instruction is inappropriate since it represents "a skillful effort to induce the trial court to argue the case for the defense through its instructions." Aside from concerns with the internal inconsistencies to the opinion, I question the claim that the instructions given to the jury were sufficient to cover the offered instruction.

The eyewitness instruction does not define reasonable doubt, but is a step in the right direction toward forcing the jury onto a common ground of what is meant by *"beyond a reasonable doubt"* before they find the defendant guilty. While the given instructions refer to *"beyond a reasonable doubt,"* the instructions give no guidance about what that means. If the evidence offered by both the prosecution and the defense can tell two reasonable stories, one implying the defendant is innocent and one implying guilt, is there reasonable doubt? If the "circumstances, no matter how strong, can be reasonably reconciled with the theory that some other person may have done the act," *Mulligan v. State*, 513 P.2d 180, 181 (Wyo.1973), is that reasonable doubt? *See Blakely v. State*, 542 P.2d 857 (Wyo.1975), overruling inconsistent portions of *Mulligan*. If the standard of *"beyond a reasonable doubt"* is objective, then a common understanding by the jurors should be secured by telling them what that means. If the standard is subjective, then members of a jury may not actually be unanimous about a defendant's guilt because they may not have grounded their verdict upon a common understanding of *"beyond a reasonable doubt."*

The offered instructions were designed to assist in the mental calculations about what could cast reasonable doubt on the testimony of the eyewitness. Instruction No. 14 asked the jury to consciously consider how far or close the witness was, how good the lighting conditions were, whether the witness had been exposed to the person in the past, and the length of time available to the witness to observe the person. This is not a skillful effort to induce the trial

court to argue the case for the defense. Indeed, if the eyewitness was close, the lighting was good, the witness knew the person in the past, and had sufficient time to observe the person, then this instruction would work more to the benefit of the prosecution than the defendant.

The eyewitness was a bank teller who was roughly forty feet from the car. She testified that it was so sunny that the windshield of the car glared into her eyes. She also testified that she did not see who put the check into the tube. While she said she remembered Pearson, she was unable to remember that she testified at the preliminary hearing that the car was one color while testifying at trial that the car was a different color. She also indicated that "black people can't be told apart, and they all kind of look the same." I do not understand why the majority believes a jury should not be given an instruction which cautions them about the capacity and opportunity of an eyewitness to provide a detailed identifying reconstruction of an observed event.

Again, while I do not argue that a *Telfaire* kind of instruction or the use of experts on eyewitness testimony is appropriate in all cases, this is one in which the giving of the instruction appears not only justified, but required in the interest of the search for truth in jury decision. Where an eyewitness becomes a "serious ingredient[ ] in the determination of guilt or innocence," *Thomas*, 784 P.2d at 241, Urbigkit, J. specially concurring, the defendant should be allowed to give an eyewitness instruction to the jury.

This case presents another problem in utilization of bad acts cross-examination for prosecutorial effect. It is a difficult subject to properly handle in the context of occurrences at trial, appeal preparation and now, presentation to this court. Perhaps when all else fails, resort to the unvarnished facts provide the best refuge for the reviewing jurist. In any event, as related in majority opinion, the prosecutor during cross-examination asked the significant alibi witness, "Isn't it true you have been an alibi witness for the defendant before?"

The question assumed a fact known to the prosecutor in the way it was asked to have been untrue. The prosecutor knew the witness had not previously testified in behalf of Pearson. Actually, the witness had been interviewed by the prosecutor for another occurrence and his information caused the prosecutor to dismiss the then pending charges. The problem in initial trial context was that defense counsel for Pearson did not know of the intentionally misstated nature of the question and this was followed by the witness' answer of "yes" before the objection could be stated which the witness answered based on an office interview and not as oral testimony as suggested by the question.

The problem with all of this, which is the subject of bad acts evidentiary usage for prosecution, is that appellate counsel first became aware of the character of conduct of the prosecutor just before oral argument in this court on December 5, 1990, and as then followed by reference during oral argument, a motion to supplement the record was filed which stated:

COMES NOW the Appellant, James Pearson, by and through his counsel, Gerald M. Gallivan, and respectfully requests this Court for an Order granting counsel to supplement the record, hold an evidentiary hearing, and brief a new issue. As grounds for this Motion, Appellant states:

1. Oral argument on the appeal in the above captioned matter for forgery was held on December 5, 1990.

2. The day prior to oral argument, counsel became aware of a critical mistake in Issue I of appellant's brief regarding the improper questioning at trial of Appellant's alibi witness, * * *.

3. Counsel was not at fault for failure to bring this issue to the Court's attention earlier.

4. Defendant contends that there are special circumstances surrounding this case as set forth in the supporting memorandum, which the Court needs to consider in granting this Motion.

In the first paragraph of the supporting memorandum to the motion to supplement the record, Pearson's counsel related:

As this Court is aware, the Appellant's counsel first learned immediately before oral argument that the record in this case is ambiguous, if not misleading. Specifically, the prosecutor's objectionable question of the alibi witness concealed the truth that this witness had never testified previously for the defendant. In fact, the prosecutor, * * *, had dismissed unfounded charges after an office conference with defense counsel, * * *, and the witness. This version of the events raises the critical issue of the prosecutor intentionally misleading the jury and would be a separate basis for reversal in this case.

In the absence of this writer at conference, the motion, after resistance from the State without contesting affidavits, was denied by this court. *The facts stated in tendered affidavits with the motion were not denied.* I consider that a denial at least of the opportunity to supplement the record was in error and furthermore cannot assume for opinion writing an alleged fact I have absolutely no reason to believe is true. Consequently, it is necessary to approach the bad acts/bad reputation of the alibi witness procedural creation in this case, both with consideration of its appropriateness—there was an objection taken, and that the question intentionally assumed a fact that was not true for the purpose of rhetorically attacking the reputation of the witness. On the factual record available, the alibi witness used for Pearson had not been a previous alibi witness for him before.

Bad acts evidentiary prosecution in justification or misuse cannot be separated from the strength of the intrinsic actual evidence of guilt. American courts and particularly Wyoming has gone a long way down the pathway of prosecution by reputation and prejudicial use of extraneously applied intimations of unsavory character. Reincarnated scholars of times past with an understanding of the law that conviction is based on evidence of guilt would be appalled by what Wyoming has reached in

adaptation and application of W.R.E. 404(a) and (b). See, for example, *Gezzi v. State,* 780 P.2d 972 (Wyo.1989), Urbigkit, J., dissenting; *Pena v. State,* 780 P.2d 316 (Wyo. 1989), Urbigkit, J., dissenting; and *Brown v. State,* 736 P.2d 1110 (Wyo.1987), Urbigkit, J., dissenting.

Any casual consideration of the sweep of criminal cases now appearing in the reporter systems quickly reveal that the American justice delivery system today tends not to seek guilt so much as punishment for the nature of the defendant's conduct of his life. Intrinsically included is the supposition "if he or she did not do it this time, there are probably other offenses for which the present guilty defendant was never caught." Added to this thesis in harmless error and absolution is the further concept that if the evidence of guilt is solid, bad acts evidence does not separately cause conviction.

This is in no regard a strong evidentiary case of guilt. Racial prejudice, intimation of a previous history of bad conduct and a questionable identification supplemented by a thinly disguised mathematically directed racial final argument resulted in conviction. Pearson did not testify by virtue of a prior conviction which, in its nature as a drug case, balanced the further prejudice from race to drug dealing if he chose to explain his side of the story.

Furthermore, it is a little hard to tell what this majority, the prosecution or, for that matter, the jury thought the charged offense actually was. The scenario here provides three sequences. Someone stole a briefcase from a customer's car at the Casper Provident Savings and Loan parking lot. Thereafter, a check was extracted from the briefcase and was completed by the miscreant with included forged signature. Finally, the third action was attempted negotiation at a Casper bank which was unsuccessful.

The criminal information was stated as forgery and, alternatively, transfer. The development of the case and the admission of the prosecution makes clear that in no regard did the State attempt to prove that Pearson was involved in the initial automobile break-in or subsequent forgery. Furthermore, no attempt was alleged as a charge and no transfer was ever completed. The specific statute, W.S. 6–3–602, is a forgery statute. The possession statute, W.S. 6–3–603, is not included as a charged offense in the information.

As noted, there is no evidence in this record that Pearson was involved in sequence one—car theft—or sequence two—check completion as a forgery. The investigating officers according to the record made no observable effort to obtain or provide trial evidence to prove that the forgery was in the handwriting of Pearson. Additionally, no police department effort was made to obtain fingerprints from the briefcase, other papers in the briefcase, the forged check, or the container used at the drive-in bank facility.[1]

The foregoing provides another problem that relates to the identification, bad acts and mathematical proof which no one heretofore has seemed to consider. There may be an attempt offense to "negotiate" or "transfer", but not completed crime offense since the check was never accepted by the bank for negotiation and payment. In fact, we have here a non-pleaded "attempt" charge of transfer or negotiation of a known forged instrument supported by, at best, slight real evidence and no specific allegation in information for trial proof. Unfortunately, no one has previously considered this case in this perspective and briefing or review of the "attempt" versus "completed crime" is not addressed nor is any review or definition of the word "transfer" attempted.

The foregoing status of this case provides a perspective of danger from a "mathematical" proof argument. The

---

**1.** A casual comparison of the forged check with the file material which provides the signature of Pearson would suggest at least to the ordinarily experienced practicing lawyer that unless Pearson had an avocation not revealed by the pre-sentence investigation report, he did not do the forgery. One would assume that is the reason the police did not attempt to determine one way or another whether he had or had not.

questioned argument related to a tall black and a Chevrolet Camaro Z28 automobile as a matter of one sight identification. We can judicially notice that there are a significant number of blacks in Casper, Wyoming. The 1990 census figures would tell us that. Likewise, it would be appropriate to recognize from local newspaper reports that Pearson, when observed from a distance of approximately forty feet, did not happen to be the only black brought into Casper to play basketball at the local community college.

The trial judge was clearly wrong in overruling the objection taken to the mathematical probability argument of the prosecutor which, in summation, combined with the embedded racial issue substituted guess for certainty in the premises used for probability. *See* Tribe, *Trial by Mathematics: Precision and Ritual in the Legal Process*, 84 Harv.L.Rev. 1329 (1971) and McCormick on Evidence § 210 at 652 (3rd ed. 1984). The basic and seminal case of *People v. Collins*, 68 Cal.2d 319, 66 Cal.Rptr. 497, 438 P.2d 33 (1968) is also most informative with some striking factual similarities.

I am unpersuaded that the majority properly understands Professor Tribe's article in present opinion attempt to differentiate final argument from expert witness testimony. In careful reading, I do not find the final argument to be excluded from the prosecutorial "mathematical proof." In blunt terms, the difference is that when this kind of argument is used, the expert provided as a witness is the prosecuting attorney himself.

In initial concept, Professor Tribe stated:

In speaking of mathematical methods "in the trial process," I am referring to two related but nonetheless separable topics: not only to the use of mathematical tools in the actual conduct of a partic-

ular trial, but also to the use of such tools in the design of the trial system as a whole. The first topic encompasses such questions as the propriety of allowing the parties in a lawsuit to employ explicitly statistical evidence or overtly probabilistic arguments for various purposes, and the wisdom of permitting or encouraging the trier to resolve the conflicting claims of a lawsuit with the assistance of mathematical methods.

Tribe, *supra*, 84 Harv.L.Rev. at 1330 (footnote omitted).

I suspect that this majority's suggestion that final argument usage of the mathematical proof contention is not a "tool for decisionmaking" would come to Professor Tribe as a great surprise. Clearly, argument as well as expert testimony based on the prosecutor's assumption of probabilities is of the essence in the case of *Collins*. Professor Tribe stated:

First, my subject is the use of mathematics as a tool for decisionmaking rather than simply as a mode of thought, as an instrument rather than as a language. * * *

Second, although my central concern is the wisdom of using mathematical methods for certain decisionmaking purposes even when those methods are rationally employed, I will also examine what must be regarded as clearly irrational uses of those methods.

Tribe, *supra*, 84 Harv.L.Rev. at 1331 (footnote omitted).

Combined with my persuasions that Professor Tribe's cogent and comprehensive analysis specifically applies here to a black in Casper defined in oral argument mathematically to prove identity, I would also recognize his enumeration of the separate significance of mathematical decision to determine identity.[2] Usage by the argument

---

**2.** In footnote analysis in the law journal, Professor Tribe related:

A quite distinct problem, more serious in cases relying on human identification than in cases where identification is based on physical evidence, is that the characteristics of the defendant relied upon in the probabilistic formula may not in fact have been shared by the

actually guilty individual or individuals because of some mistake in observation or memory. Such risks of error, like the risk of frame-up, are hard to quantify and hence likely to be underemphasized in a quantitative analysis, but differ from the risk of frame-up in that they need not perversely increase as

approach personified in this case is more pervasive since no one provided information to the jury about the number of vehicles of that kind in Casper and how many young blacks might be available for comparison.

There is a further source for education in mathematical evidence in criminal cases stated in McCord, *A Primer for the Non-mathematically Inclined on Mathematical Evidence in Criminal Cases: People v. Collins and Beyond*, 47 Wash. & Lee L.Rev. 741 (1990).[3] Our present case fits specifically into the McCord fourth category:

> The fourth category is called "non-empirical probabilities of guilt developed without empirical statistics and without Bayes' Theorem." This category is composed of instances where the prosecutor, in line with the mathematical probabilist tenet that all evidence is inherently probabilistic, probabilizes non-empirically sampled data, and then further relies on the probabilist position that the burden of persuasion is probabilistic by arguing that the subjective probability of guilt

based upon the non-empirically sampled data is sufficient to convict, all without using Bayes' Theorem. The quintessential example of this category is *People v. Collins*.

*Id.* at 759.

In addition to *Collins*, we find specific reference to prejudicial harm in summation discussion by use of mathematical proof in *United States v. Massey*, 594 F.2d 676 (8th Cir.1979), limited by exclusion of blood type testing *sub nom. United States v. Kandiel*, 865 F.2d 967 (8th Cir.1989). *Cf. Huf v. State*, 675 P.2d 268 (Alaska App.1984), where it was deemed to be harmless error since only used in argument in a very strong evidentiary case. In addition to *Collins* and *Massey*, general case law on evidentiary misuse of mathematical proof is persistently available to demonstrate the total impropriety of the racially directed, statistically invalid foray of prosecutor in summation portrayed here. *See Miller v. State*, 240 Ark. 340, 399 S.W.2d 268 (1966); *People v. Collins*, 43 Mich.App. 259, 204 N.W.2d 290 (1972), *cert. denied* 419 U.S. 866, 95 S.Ct. 121, 42 L.Ed.2d 103 (1974);

---

the apparent probative value of the evidence increases.

Tribe, *supra*, 84 Harv.L.Rev. at 1363 n. 111. Professor Tribe then concludes in regard to fact directed use of mathematics:

> I am not yet prepared to say that the costs of mathematical precision enumerated here are so great as to outweigh any possible gain that might be derived from the carefully limited use of probabilistic proof in special circumstances. I do think it clear, however, that those circumstances would have to be extraordinary indeed for the proponents of mathematical methods of proof to make even a plausible case.
>
> With the possible exception of using statistical data to shift the burden of production, and perhaps with the further exception of using evidence as to frequencies in order to negate a misleading impression of uniqueness that expert opinion might otherwise convey, I think it fair to say that the costs of attempting to integrate mathematics into the factfinding process of a legal trial outweigh the benefits.

*Id.* at 1377 (footnote omitted). And then finally for the basic subject states:

> In an era when the power but not the wisdom of science is increasingly taken for granted, there has been a rapidly growing interest in the conjunction of mathematics and the trial process. The literature of legal praise for the progeny of such a wedding has

been little short of lyrical. Surely the time has come for someone to suggest that the union would be more dangerous than fruitful.

*Id.* at 1393. (This was just twenty years ago when written.) *See also* Finkelstein and Fairley, *The Continuing Debate Over Mathematics in the Law of Evidence*, 84 Harv.L.Rev. 1801 (1971) and Tribe, *A Further Critique of Mathematical Proof*, 84 Harv.L.Rev. 1810 (1971).

**3.** By reference to this current law journal, I do not intend to suggest a limited supply of authoritative writings on this subject. If we include the current rash of DNA testing articles (for most recent example, see Comment, *DNA Fingerprinting: Evidence of the Future*, 79 Ky.L.J. 415 (1991) and Comment, *Admissibility of DNA Genetic Profiling Evidence in Criminal Proceedings: The Case for Caution*, 18 Pepperdine L.Rev. 123 (1990)), a number of reviews and writings in legal and scientific journal sources, in addition to at least two books relating to the subject of mathematical proof may exceed a hundred in number. In a generic way, compare Tribe, *The Curvature of Constitutional Space: What Lawyers Can Learn From Modern Physics*, 103 Harv.L.Rev. 1 (1989) to Reynolds, *Chaos and the Court*, 91 Colum.L.Rev. 110 (1991). *See also* Comment, *Evidence—Rules of Admissibility and the Law of Probability*, VIII Land & Water L.Rev. 285 (1973).

*State v. Sneed,* 76 N.M. 349, 414 P.2d 858 (1966); and *Brown v. State,* 751 P.2d 1078 (Okl.Cr.1988). *See also Branion v. Gramly,* 855 F.2d 1256 (7th Cir.1988), *cert. denied* 490 U.S. 1008, 109 S.Ct. 1645, 104 L.Ed.2d 160 (1989); *Graham v. State,* 168 Ga.App. 23, 308 S.E.2d 413 (1983), Dean, P.J., specially concurring; *People v. Harbold,* 124 Ill.App.3d 363, 79 Ill.Dec. 830, 464 N.E.2d 734 (1984); *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976); and *Phillips By and Through Utah State Dept. of Social Services v. Jackson,* 615 P.2d 1228 (Utah 1980); but see, however, *People v. Prewitt,* 160 Ill.App.3d 942, 112 Ill.Dec. 368, 513 N.E.2d 977 (1987); *Com. v. Drayton,* 386 Mass. 39, 434 N.E.2d 997 (1982); *People v. Bailey,* 36 Mich.App. 272, 193 N.W.2d 405 (1971); and *State v. Woodall,* 385 S.E.2d 253 (W.Va.1989).

What is so strange about all of this is that the mathematical proof overstatement has been definitively addressed by this court in a plain error context in *Stephens v. State,* 774 P.2d 60, 64 (Wyo.1989) (emphasis added):

> The expert witnesses included a pediatrician who had examined and treated cases of child sexual abuse and who had testified as an expert on the subject in several trials. He described some symptoms, both physical and behavioral, that, in his opinion, are commonly displayed by child victims of sexual abuse. The symptoms that he related included an unusual awareness of specific sexual acts, such as oral copulation, bed-wetting, changes in moods, and nightmares. This victim displayed all of these symptoms described by the witness. The doctor advised the jury that statistically eighty to eighty-five percent of child sexual abuse is committed by a relative close to the child. No objection was made to this testimony and, although one court has found error in the admission of such testimony, *State v. Petrich,* 101 Wash.2d 566, 683 P.2d 173 (1984), we do not perceive that testimony to be plain error. *It is difficult, however, to understand how statistical information would assist a trier of fact in reaching a determination as to guilt in an individual case*

and, *had an objection been made, it should have been sustained.*

I would reverse and remand for retrial.